**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DAWN MARVIN,**

                        **Plaintiff,**                    **3:12-cv-1779**
                                                          **(GLS)**

              **v.**

**CAROLYN W. COLVIN**,
Acting Commissioner of Social
Security,

                        **Defendant.**
_____

**APPEARANCES:**                         **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Lachman, Gorton Law Firm           PETER A. GORTON, ESQ.
P.O. Box 89
1500 East Main Street
Endicott, NY 13761-0089

**FOR THE DEFENDANT:**
HON. RICHARD S. HARTUNIAN           JOANNE JACKSON
United States Attorney              TOMASINA DIGRIGOLI
100 South Clinton Street            Special Assistant U.S. Attorneys
Syracuse, NY 13261

Steven P. Conte
Regional Chief Counsel
Social Security Administration
Office of General Counsel, Region II
26 Federal Plaza, Room 3904
New York, NY 10278

**Gary L. Sharpe**
**Chief Judge**

## MEMORANDUM-DECISION AND ORDER

## I. Introduction

Plaintiff Dawn Marvin challenges the Commissioner of Social Security's denial of Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), seeking judicial review under 42 U.S.C. §§ 405(g) and 1383(c)(3).  (Compl., Dkt. No. 1.)  After reviewing the administrative record and carefully considering Marvin's arguments, the Commissioner's decision is reversed and remanded for further administrative proceedings.

## II. Background

On August 20, 2008, Marvin filed applications for DIB and SSI under the Social Security Act ("the Act"), alleging disability since January 1, 2006.  (Tr.[1] at 96-97, 208-10, 211-17.)  After her applications were denied, (*id.* at 120-25), Marvin requested a hearing before an Administrative Law Judge (ALJ), (*id.* at 133-35), which was held on February 22, 2010 and October 12, 2011, (*id.* at 30-71, 72-95).  On November 4, 2011, the ALJ issued an unfavorable decision denying the requested benefits, which became the Commissioner's final determination upon the Social Security Administration

_____

[1] Page references preceded by "Tr." are to the Administrative Transcript.  (Dkt. No. 8.)

Appeals Council's denial of review.  (*Id.* at 1-5, 7-29.)

Marvin commenced the present action by filing her complaint on December 4, 2012, wherein she sought review of the Commissioner's determination.  (*See generally* Compl.)  The Commissioner filed an answer and a certified copy of the administrative transcript.  (Dkt. Nos. 7, 8.)  Each party, seeking judgment on the pleadings, filed a brief.  (Dkt. Nos. 17, 18.)

### III.  Contentions

Marvin contends that the Commissioner's decision is tainted by legal error and is not supported by substantial evidence.  (Dkt. No. 17 at 7-25.) Specifically, Marvin claims that: (1) the ALJ did not consider all of the relevant evidence, as he failed to mention Marvin's low Global Assessment of Functioning (GAF) scores; (2) the ALJ committed factual and legal errors at step three, by failing to find that Marvin met listing 12.04; (3) the ALJ's determination of Marvin's mental residual functional capacity (RFC) was unsupported by substantial evidence because the ALJ improperly assessed Marvin's treating providers' opinions and afforded improper weight to agency consultants; (4) the ALJ erred in assessing Marvin's credibility; and (5) the ALJ committed legal errors at step five because he improperly relied on a vocational expert's (VE) telephonic testimony in

determining that there was a significant number of jobs available to Marvin and failed to consider Marvin's ability to work on a consistent basis. (*Id.*) The Commissioner counters that the appropriate legal standards were used by the ALJ and his decision is also supported by substantial evidence. (Dkt. No. 18 at 2-22.)

## IV.  <u>Facts</u>

The court adopts the parties' undisputed factual recitations. (Dkt. No. 17 at 1-7; Dkt. No. 18 at 2.)

## V.  <u>Standard of Review</u>

The standard for reviewing the Commissioner's final decision under 42 U.S.C. § 405(g)[2] is well established and will not be repeated here. For a full discussion of the standard and the five-step process by which the Commissioner evaluates whether a claimant is disabled under the Act, the court refers the parties to its previous decision in *Christiana v. Comm'r of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008).

---

[2] Review under 42 U.S.C. §§ 405(g) and 1383(c)(3) is identical. As such, parallel citations to the regulations governing SSI are omitted.

# VI.  Discussion

## A.    Failure to Consider GAF Scores

First, Marvin argues that the ALJ committed legal error when he failed to consider her GAF scores.  (Dkt. No. 17 at 12-13.)  The Commissioner counters, and the court agrees, that the ALJ was not required to explicitly mention the GAF scores.  (Dkt. No. 18 at 8-9.)

Under 20 C.F.R. § 404.1520(3), the ALJ must "consider all evidence" in order to determine whether a claimant is disabled.  It is also true, however, that an ALJ "is not required to discuss all the evidence submitted, and his failure to cite specific evidence does not indicate it was not considered."  *Santos v. Astrue*, 709 F. Supp. 2d 207, 211 (S.D.N.Y. 2010) (quoting *Barringer v. Comm'r of Soc. Sec.*, 358 F. Supp. 2d 67, 79 (N.D.N.Y. 2005)); *see Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) ("When . . . the evidence of record permits [the court] to glean the rationale of an ALJ's decision, we do not require that [the ALJ] have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.").

As relevant here, GAF is a scale that indicates a clinician's overall

opinion of an individual's psychological, social, and occupational functioning. *See Petrie v. Astrue*, 412 F. App'x 401, 406 n.2 (2d Cir. 2011) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 376-77 (4th ed., text revision, 2000)). GAF scores between fifty-one and sixty indicate that the individual "has moderate symptoms or moderate difficulty in social, occupational, or school situations." *Id.*; *see Parker-Grose v. Astrue*, 462 F. App'x 16, 18 (2d Cir. 2012). GAF scores of forty-one to fifty indicate that the individual has "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Stewart v. Astrue*, No. 10-CV-3032, 2012 WL 314867, at *2 n.1 (E.D.N.Y. Feb. 1, 2012) (internal quotation marks and citations omitted).

Here, Marvin contends that the ALJ's failure to explicitly mention her "consistently low GAF scores" was legal error. (Dkt. No. 17 at 12-13.) Marvin's GAF scores ranged from forty-eight to sixty, with a score of fifty-five being the most consistent. (Tr. at 368, 388, 401, 413, 527, 536-541, 543-50, 631, 666-67, 670-74.) While it is true that GAF scores may be relevant to an ALJ's severity and RFC determinations, *see Parker-Grose*,

462 F. App'x at 17-18; *Ortiz Torres v. Colvin*, 939 F. Supp. 2d 172, 184 (N.D.N.Y. 2013), the ALJ need not explicitly mention the GAF score, *see Ortiz Torres*, 939 F. Supp. 2d at 184 ("This Court rules that the hearing officer's failure to discuss the [GAF] scores does not constitute an error worthy of remand."); *Dwyer v. Astrue*, 800 F. Supp. 2d 542, 548 (S.D.N.Y. 2011) (noting that "the ALJ's failure to mention [the claimant's] GAF of [fifty] is insufficient to conclude that she failed to consider it").  Here, as an initial matter, the ALJ determined that Marvin's impairments were severe, rendering his failure to explicitly mention Marvin's GAF score insignificant with respect to the severity determination.  (Tr. at 13-15.)  Further, the court is satisfied that the ALJ properly considered all of the evidence available to him.  Indeed, the ALJ discussed at length the opinion of consultative psychological examiner Dr. Mary Ann Moore, which reflected Marvin's lowest GAF score of forty-eight.  (Tr. at 13, 20, 631.)  Thus, the ALJ's failure to state Marvin's GAF scores does not amount to legal error.

B.    <u>Listing 12.04</u>

Second, Marvin contends that the ALJ committed factual and legal errors at step three because Marvin's mental impairment meets the requirements of listing 12.04, specifically paragraphs A and B.  (Dkt. No.

17 at 21-22.)  In opposition, the Commissioner argues that the ALJ's listing determination is supported by substantial evidence.[3]  (Dkt. No. 18 at 20-22.)  The court agrees with the Commissioner.

By way of background, affective disorders, which are "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome," constitute a listing level impairment, and presumptive disability, provided that the claimant meets the requirements set forth in paragraphs A and B, or the claimant satisfies the requirements set forth in paragraph C, of listing 12.04.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04.  Here, the parties do not dispute whether the paragraph A criteria were met, but instead address only the paragraph B criteria.[4]  Paragraph B requires that a claimant's mental impairment result in at least two of the following: "(1) [m]arked restriction of activities of daily living; or (2) [m]arked difficulties in maintaining social functioning; or (3) [m]arked difficulties in maintaining concentration, persistence, or pace; or (4)

───────────────────

[3] "Substantial evidence is defined as more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept to support a conclusion."  *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) (internal quotation marks and citations omitted).

[4] Marvin mostly takes issue with the ALJ's reliance on non-treating sources.  (Dkt. No. 17 at 20-22.)  Although the court addresses below the ALJ's apportionment of weight among the medical sources, *see infra* Part VI.C, the court nevertheless considers whether substantial evidence supports the ALJ's listing determination.

[r]epeated episodes of decompensation, each of extended duration." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04(B).

Here, ultimately concluding that the paragraph B criteria were not met, the ALJ found that Marvin suffered from mild limitations in activities of daily living, mild restrictions in social functioning, moderate difficulties with regard to concentration, persistence or pace, and no episodes of decompensation. (Tr. at 15-17.) In so deciding, the ALJ predominantly relied on the opinions of consulting examining physicians Drs. Justine Magurno and Dennis Noia, and treatment notes from FNP Ryan Little. (*Id.* at 16, 429-32, 433-37, 672-73.)

First, with respect to activities of daily living, the record establishes that Marvin is able to care for her three children, cook, clean, do laundry, shop, attend to her own personal hygienic needs, watch television, listen to the radio, and take the bus several times each week. (*Id.* at 82, 84-86, 90-91, 431-32, 434, 454.) Thus, substantial evidence supports the ALJ's decision that Marvin suffered from only a mild impairment in activities of daily living.

Second, with respect to social functioning, the record establishes that Marvin socializes with friends and family, has a boyfriend, spends most

days caring for her children—occasionally taking them to the park and to the mall—travels to the methadone clinic several times each week, and meets with two separate counselors/clinicians.  (*Id.* at 84-85, 86-89, 90-91, 431-32, 434, 454.)  Given this evidence, the ALJ's decision that Marvin has only mild restrictions in social functioning is supported by substantial evidence.

Third, with regard to concentration, persistence, and pace, Marvin is able to manage money, do counting, simple calculations, and serial threes, and Dr. Noia noted that "[h]er attention and concentration [were] intact." (*Id.* at 431-32.)  Additionally, consulting non-examining physician Dr. Maria Morog concluded that Marvin was "not significantly limited" with respect to most areas regarding her ability to sustain concentration and persistence. (*Id.* at 452-54.)  Nevertheless, as the ALJ noted, Marvin has a history of drug and alcohol abuse, and relapsed on alcohol as recently as January 2011 and on drugs as recently as May 2007.  (*Id.* at 16, 430, 672-73.)  The ALJ also cited FNP Little's notation in a February 1, 2011 report that Marvin reported decreased concentration.  (*Id.* at 16, 672-73.)  While Marvin certainly has some limitations, the ALJ's determination that she suffered from moderate restrictions in concentration, persistence, and pace

is supported by substantial evidence.

Finally, there is no evidence that Marvin suffered any episodes of decompensation. While Marvin points to her prior hospitalizations to refute the ALJ's statement that "[t]here is no evidence of psychiatric hospitalization," (Dkt. No. 18 at 21; Tr. at 16), all of Marvin's hospitalizations occurred prior to her alleged onset date of January 1, 2006, (Tr. at 522, 628). Thus, the ALJ correctly determined that the paragraph B criteria were not met, and the ALJ's conclusion that Marvin does not meet the 12.04 listing is supported by substantial evidence.

## C.   RFC Determination

The ALJ found Marvin to retain the RFC[5] to perform light work, and that, mentally, she is

> able to understand, carry out, and remember simple instructions, use appropriate judgment to make simple work related decisions, respond appropriately to supervision, co-workers, and usual work situations, and deal with changes in a routine work setting. [However, she] should have no more than occasional interaction with co-workers, supervisors, and the general public in an occupation with little change in job duties or routine on a daily basis.

---

[5] A claimant's RFC "is the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). In assessing a claimant's RFC, an ALJ must consider "all of the relevant medical and other evidence," including a claimant's subjective complaints of pain. *Id.* at § 404.1545(a)(3). An ALJ's RFC determination must be supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g).

(*Id.* at 17.)  Marvin takes issue only with the ALJ's determination of her mental RFC.  (Dkt. No. 17 at 16-20, 22-23.)

The thrust of Marvin's argument is that the ALJ's misappropriation of weight to the medical sources resulted in a flawed RFC determination. (*Id.*)  The Commissioner counters that the ALJ properly discounted acceptable treating sources' opinions and RFC assessments because they were inconsistent with other substantial evidence in the record.  (Dkt. No. 18 at 12-21.)  The court agrees with the Commissioner.

In determining a claimant's RFC, evidence from multiple sources often conflicts, thus requiring administrative law judges to make credibility assessments, and decide how much weight to give particular items of evidence.  *See Mauzy v. Colvin*, No. 5:12-cv-866, 2014 WL 582246, at *6 (N.D.N.Y. Feb. 13, 2014).  Through various regulations and internal policy rulings, the Commissioner provides guidance in the form of protocols for determining credibility of subjective testimony,[6] opinions of "treating" sources,[7] opinions of "acceptable" medical sources,[8] and opinions of

---

[6] *See* 42 U.S.C. § 1382c (a)(3)(A); 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p, 61 Fed. Reg. 34,483, 34,484-85 (July 2, 1996).

[7] *See* 20 C.F.R. § 404.1502 ("Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you,

12

"other" medical sources.[9]  Generally, they follow similar patterns. Testimony and other evidence are compared to objective factors that enhance or support credibility.  The closer the evidence matches objective factors, the more likely its credibility.

With this guidance in mind, the court is also mindful that, generally, an ALJ is required to give controlling weight to a treating physician's medical opinion if it is supported by acceptable diagnostic techniques and is not inconsistent with other substantial evidence in the record.  *See* 20 C.F.R. § 404.1527(c)(2); *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  The ALJ is required to explain the weight he gives to the opinions of a treating physician.  *See* 20 C.F.R. § 404.1527(c)(2).  When an ALJ does not give a treating physician's opinion controlling weight, he must assess several factors to determine how much weight to give the opinion,

---

with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.").

[8] *See* 20 C.F.R. § 404.1513(a). "Acceptable medical source refers to one of the sources described in § 404.1513(a) who provides evidence about your impairments.  It includes treating sources, nontreating sources, and nonexamining sources."  20 C.F.R. § 404.1502.  Only "acceptable" medical sources may give medical opinions and be considered treating sources whose medical opinions may be entitled to controlling weight. *See* SSR 06-03p, 71 Fed. Reg. 45,593, 45,594 (Aug. 9, 2006)..

[9] "Other" sources are ancillary providers such as nurse practitioners, physician assistants, licensed clinical social workers, and therapists.  20 C.F.R. § 404.1513(d); SSR 06-03p, 71 Fed. Reg at 45,594.

including: (1) the length, nature, and extent of the treatment relationship; (2) the frequency of examination by the treating physician for the conditions in question; (3) the medical evidence and explanations provided in support of the opinion; (4) the consistency of the opinion with the record as a whole; (5) the qualifications of the treating physician; and (6) other relevant factors tending to support or contradict the opinion. *See id.* § 404.1527(c)(2)-(6). Additionally, the opinion of a non-examining source can override the opinion of an examining source if it is supported by evidence in the record. *See Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995); *see also Netter v. Astrue*, 272 F. App'x 54, 55-56 (2d Cir. 2008); *Beasock v. Colvin*, No. 6:12-cv-1355, 2014 WL 421324, at *9 (N.D.N.Y. Feb. 4, 2014); *Everson v. Comm'r of Soc. Sec.*, No. 6:11-cv-901, 2012 WL 3061944, at *2 (N.D.N.Y. July 26, 2012). The court now turns to the weight afforded to each medical source.

    1.    *Examining Psychiatric Consultant Dr. Noia*

First, the ALJ gave significant weight to the report completed by Dr. Noia "due to [his] programmatic expertise and examinations of [Marvin]," and also because his conclusions were consistent with the record. (Tr. at 19-20, 429-32.) Dr. Noia diagnosed Marvin with depressive disorder NOS,

panic disorder NOS, crack cocaine and cannibus use—in full remission—and heroine addiction—maintained with methadone. (*Id.* at 432.) He further opined that Marvin is capable of understanding and following simple instructions and directions, performing simple and some complex tasks with supervision and independently, maintaining attention and concentration for tasks, attending to a routine and maintaining a schedule, learning new tasks, making appropriate decisions, and relating to and interacting moderately well with others. (*Id.*)

Upon review of the record, the court is satisfied that Dr. Noia's opinion is consistent with the rest of the medical evidence. Indeed, although Marvin contends that Dr. Noia's report is insufficient because it fails to mention Marvin's past hallucinations and suicidal ideation, (Dkt. No. 17 at 18), Dr. Noia's report discusses her "history of psychiatric hospitalizations, including 2002, Strong Memorial Hospital," and her history of panic attacks, (Tr. at 429). Additionally, consistent with Marvin's medical records and testimony, Dr. Noia's report states and considers Marvin's history of drug use, (*id.* at 389, 430), and notes that her symptoms of depression and panic attacks have improved with treatment, (*id.* at 37, 430).

Moreover, in his medical source statement, Dr. Noia opines that Marvin can regularly attend to a routine and maintain a schedule, which is supported by her documented ability to go to the methadone clinic for treatment six days per week and her ability to maintain a routine with her children. (*Id.* at 86-88, 89-91, 432.) Further, despite Marvin's objections that the record proves otherwise, (Dkt. No. 17 at 18), Dr. Noia's conclusion that Marvin can maintain concentration and attention is corroborated by Dr. Moore's evaluation, which indicated that Marvin's ability to maintain attention and concentration was normal. (Tr. at 432, 630); *see Bonet ex rel. T.B. v. Colvin*, 423 F. App'x 58, 59 (2d. Cir. 2013) (noting that "whether there is substantial evidence supporting the appellant's view is not the question;" instead, the court must "decide whether substantial evidence supports *the ALJ's decision*"). Finally, Dr. Noia's medical source statement also accounts for some of Marvin's documented limitations, and states that she interacts "moderately well" with others and "has a history of difficulty dealing with stress." (Tr. at 432.)

2.    *Non-Examining Psychological Consultant Dr. Morog*

Second, the ALJ gave "some weight" to the reports of Dr. Morog due to her programmatic expertise and review of Marvin's medical records. (*Id.*

at 20, 438-51, 452-55.)  Dr. Morog completed a psychiatric review technique and a mental RFC assessment.  (*Id.* at 438-51, 452-55.)  She concluded that Marvin was not significantly limited in most areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation.  (*Id.* at 452-53.)

Marvin contends that Dr. Morog gave no explanation for her opinions, and, therefore, they are not entitled to any weight.  (Dkt. No. 17 at 19.)  However, Dr. Morog fully explained her opinions.  (Tr. at 454.)  In her functional capacity assessment, Dr. Morog cited Marvin's history of drug abuse, past psychiatric hospitalizations, and current methadone treatment. (*Id.*)  Dr. Morog also explained that Marvin's "statements regarding work-related mental limitations," including her difficulty concentrating and completing tasks, hesitation to being around people, and anxiety, "are credible," but that, given her daily activities, such as caring for her children, reading, going to the methadone clinic, and socializing, "it is not credible that [Marvin's] symptoms have been of such intensity, frequency or duration as to preclude all work activity."  (*Id.*)  As mentioned above, *see supra* Part VI.C, when a non-examining physician's opinions are explained and consistent with the record—as Dr. Morog's are here—the non-

examining physician's opinions may override those of an examining physician.  *See Diaz*, 59 F.3d at 313 n.5; *Thompson v. Comm'r of Soc. Sec.*, No. 7:10-CV-1085, 2011 WL 5080239, at *10 n.5 (N.D.N.Y. Aug. 18, 2011).

### 3. *Examining Psychological Consultant Dr. Moore*

Third, the ALJ gave reduced weight to Dr. Moore's assessment because she was not a treating source and because her conclusions were inconsistent with the record medical evidence.  (Tr. at 20, 627-34.)  Dr. Moore concluded that Marvin was experiencing major depression with posttraumatic stress as well as panic disorder with agoraphobia and a reading disorder.  (*Id.* at 633.)  Her diagnostic impression was that Marvin appeared permanently disabled.  (*Id.*)

The ALJ determined that Dr. Moore's opinion was inconsistent with the record because, while Dr. Moore indicated that Marvin was very limited from using public transportation, at the hearing, Marvin testified that she rides the bus almost daily.  (*Id.* at 20, 86, 631.)  The ALJ further explained that Dr. Moore's opinion was inconsistent with the record because, while Dr. Moore stated that Marvin would have difficulty maintaining a schedule, the record indicates that she regularly attends her methadone treatment

and appointments. (*Id.* at 20, 86-88.) Insofar as Dr. Moore's opinion conflicted with the other opinions in the record, the ALJ acted within his discretion in affording it less weight, because "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve," *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002), and making credibility determinations is within the ALJ's province, *Mauzy*, 2014 WL 582246, at *6. Moreover, even if substantial evidence did support Dr. Moore's viewpoints here, the court must uphold the Commissioner's finding, because "[w]here there is substantial evidence to support either position, the determination is one to be made by the factfinder." *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990); *see DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir. 1998).

### 4.    FNP Little

Fourth, the ALJ gave reduced weight to FNP Little because "he is not an acceptable medical source," yet the ALJ did consider FNP Little's reports for functional limitations, given his treating relationship with Marvin. (Tr. at 20, 464-65, 466-89, 490-94.) FNP Little opined that Marvin was not capable of any work activity, (*id.* at 464-65), and that she was extremely limited in concentration and pace, in her ability to interact with others, and in her ability to adapt and manage stress, and that her mental impairment

19

would likely cause her to be absent from work more than three days per month, (*id.* at 490-91).  Despite his treating relationship with Marvin, however, the ALJ determined that FNP Little's conclusions that Marvin suffered from extreme limitations were "wholly inconsistent with the longitudinal medical evidence in the record and [Marvin's] reported activities of daily living," and that he otherwise made conclusory statements on issues reserved to the Commissioner.  (*Id.* at 20.)

As an initial matter, contrary to Marvin's assertion, (Dkt. No. 17 at 17), it was appropriate for the ALJ to discount FNP Little's opinion because, as discussed above, *see supra* Part VI.C., he is a nurse practitioner, and therefore, his opinions are considered "other" medical sources, which are not entitled to the controlling weight generally afforded to "acceptable" medical sources, such as physicians or psychologists.  *See* 20 C.F.R. §§ 404.1502, 404.1513(a) & (d); SSR 06-03p, 71 Fed. Reg. at 43,594.  Furthermore, like Dr. Moore's opinion discussed above, Marvin's activities of daily living belie the extreme limitations suggested by FNP Little.  In particular, despite the fact that Marvin herself has stated that she occasionally goes to the mall and park with her children, is able to maintain a childcare routine, regularly takes the bus to the methadone clinic for

treatment, and spends her free time socializing with friends and family, (Tr. at 84-85, 86-87, 90-91, 432, 434), FNP Little concluded that Marvin's abilities to interact appropriately with the general public, perform activities within a schedule, maintain regular attendance and/or be punctual within customary tolerances, and sustain ordinary routine without special supervision were extremely limited, (*id.* at 490-91).

### 5. Treating Psychiatrist Dr. Kaneria

Finally, the ALJ gave "very little weight" to treating psychiatrist Dr. S.J. Kaneria, because his treatment notes are inconsistent with the record. (*Id.* at 20.) Dr. Kaneria opined that Marvin had marked restrictions in concentration and persistence, in her ability to interact with others, and in her ability to adapt and manage stress. (*Id.* at 640-42.) He also stated that Marvin's symptoms would cause her to be absent from work more than three days per month. (*Id.* at 641.)

In making his determination, the ALJ noted that, despite Marvin's well-documented history of drug use and methadone maintenance, in Dr. Kaneria's March 22, 2011 initial intake, he omits that Marvin is on methadone maintenance and instead states that she does not have a history of drug or alcohol use. (*Id.* at 20, 518-626, 635-39.) The ALJ

surmised that Marvin misstated her drug use and medical history so that Dr. Kaneria would prescribe her Klonopin—previously, on February 1, 2011, Marvin requested Klonopin from a nurse practitioner at her outpatient mental health clinic, and after it was explained to her that Klonopin is not prescribed to individuals on methadone treatment, she became upset and stated that she would go elsewhere to find a doctor willing to prescribe Klonopin for her.  (*Id.* at 20, 635, 672.)  The ALJ concluded that Marvin's "failure to give a correct history to the doctor significantly reduces the weight attributable to his evaluations and opinions."  (*Id.* at 20.)

Given this significant and material inconsistency with the rest of the record, the ALJ did not err in affording Dr. Kaneria very little weight.  *See* 20 C.F.R. § 404.1527(c)(2)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").  The ALJ fully explained his determination, and it is not for the court to disturb his thoughtful and well-reasoned credibility determination. *See Mauzy*, 2014 WL 582246, at *6.

Ultimately, although the ALJ could have discussed the factors listed in 20 C.F.R. § 404.1527(c)(2)-(6) in more detail, this shortcoming does not

amount to error because his final determination is supported by substantial evidence.  Thus, the ALJ's RFC determination is free from legal error and supported by substantial evidence.

## D.    Credibility Assessment

Marvin next argues that the ALJ did not apply the appropriate legal standards in assessing her credibility.  (Dkt. No. 17 at 14-16.)  The Commissioner argues, and the court agrees, that, in light of inconsistencies in the record that call into question Marvin's credibility, it was reasonable for the ALJ to find Marvin's subjective allegations only partially credible.  (Dkt. No. 18 at 9-12.)

Once the ALJ determines that the claimant suffers from a "medically determinable impairment[ ] that could reasonably be expected to produce the [symptoms] alleged," he "must evaluate the intensity and persistence of those symptoms considering all of the available evidence; and, to the extent that the claimant's [subjective] contentions are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry."  *Meadors v. Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010) (internal quotation marks and citations omitted).  In performing this analysis, the ALJ "must consider the entire case record and give specific reasons for the

weight given to the [claimant's] statements." SSR 96-7p, 61 Fed. Reg. 34, 483, 34,485 (July 2, 1996). Specifically, in addition to the objective medical evidence, the ALJ must consider the following factors: "1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms." *F.S. v. Astrue*, No. 1:10-CV-444, 2012 WL 514944, at *19 (N.D.N.Y. Feb. 15, 2012) (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vi)).

Here, the ALJ found that Marvin's statements concerning the intensity, persistence, and limiting effects of her symptoms were only partially credible. (Tr. at 18.) In making his determination, the ALJ relied on Marvin's treatment records, activities of daily living, and hearing testimony. (*Id.*) Although the ALJ did not undertake a step-by-step exposition of the factors articulated in 20 C.F.R. § 404.1529(c), "[f]ailure to expressly consider every factor set forth in the regulations is not grounds for remand where the reasons for the ALJ's determination of credibility are sufficiently specific to conclude that he considered the entire evidentiary record." *Judelsohn v. Astrue*, No. 11-CV-388S, 2012 WL 2401587, at *6

(W.D.N.Y. June 25, 2012) (internal quotation marks and citation omitted); *see Oliphant v. Astrue*, No. 11-CV-2431, 2012 WL 3541820, at \*22 (E.D.N.Y. Aug. 14, 2012) (stating that the 20 C.F.R. § 404.1529(c)(3) factors are included as "'examples of alternative evidence that may be useful [to the credibility inquiry], and not as a rigid, seven-step prerequisite to the ALJ's finding'" (quoting *Snyder v. Barnhart*, 323 F. Supp. 2d 542, 546 (S.D.N.Y. 2004))). Here, the ALJ explicitly acknowledged consideration of the 20 C.F.R. § 404.1529 factors, (Tr. at 17), and it is evident from his thorough discussion that his credibility determination was legally sound. *See Britt v. Astrue*, 486 F. App'x 161, 164 (2d Cir. 2012) (finding explicit mention of 20 C.F.R. § 404.1529 and SSR 96-7p as evidence that the ALJ used the proper legal standard in assessing the claimant's credibility).

Further, and importantly, inconsistencies in Marvin's statements and admitted-to misrepresentations throughout the record call her credibility into question. For example, as the ALJ noted, at the hearing, Marvin testified that she rides the bus—albeit anxiously—nearly every day, (Tr. at 40, 86-87), but she told Dr. Moore that she cannot use public transportation, (*id.* at 631). Additionally, as noted above, *see supra* Part

VI.C.5, Marvin completely omitted her history of drug and alcohol use to Dr. Kaneria during an initial intake interview.  (*Id.* at 635.)  Lastly, an April 14, 2011 treatment note states that Marvin "[a]cknowledges [that] she feigned mental health symptoms when in jail previously so as to receive medications which would significantly sedate her."  (*Id.* at 669.)  Given these inconsistencies and misrepresentations, and considering Marvin's daily activities, the ALJ's credibility assessment is supported by substantial evidence and free from legal error.

## E.    **Step Five Determination**

Next, Marvin contends that the ALJ committed legal errors at step five.  (Dkt. No. 17 at 7-12, 23-25.)  Specifically, Marvin makes three arguments: (1) the VE's testimony via telephone, over Marvin's objection, was legal error; (2) the VE's testimony did not establish that there were a significant number of jobs available to Marvin in the national and regional economy; and (3) the ALJ failed to consider Marvin's ability to work on a consistent basis.  (*Id.*)  The Commissioner argues that the ALJ's step five determination was free from legal error and supported by substantial evidence.  (Dkt. No. 18 at 5-8.)  The court agrees with Marvin that remand is required because the VE's testimony was insufficient to support a finding

that a significant number of jobs exist in the national economy.[10]

Where a claimant is able to demonstrate that her impairments prevent a return to past relevant work, as is the case here, (Tr. at 20-21), the burden then shifts to the Commissioner to prove that a job exists in the national economy which the claimant is capable of performing. *See Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (quoting *Carroll v. Sec'y of Health & Human Servs*., 705 F.2d 638, 642 (2d Cir. 1983)); *see also* 20 C.F.R. § 404.1560(c). Moreover, in making a step five ruling, an ALJ may rely on the Medical-Vocational Guidelines found in 20 C.F.R. pt. 404, subpt. P, app. 2, as long as the claimant's age, education, work experience, and RFC coincide with the criteria of a rule contained in those Guidelines. *See* 20 C.F.R. § 416.969; *see also Calabrese v. Astrue*, 358 F. App'x 274, 275 n.1 (2d Cir. 2009). However, when a claimant's nonexertional impairments "significantly limit the range of work permitted

---

[10] Given this conclusion, the court need not address Marvin's first argument: that the VE's testimony via telephone, over Marvin's objection, was reversible error. Nevertheless, the court is cognizant that there is a split among the district courts in this Circuit on this issue. *Compare Palaschak v. Astrue*, No. 3:08-cv-1172, 2010 WL 1257895, at *3-5 (N.D.N.Y. Mar. 26, 2010) (holding that the ALJ's reliance on the VE's telephonic testimony constituted harmless error), *with Koutrakos v. Astrue*, No. 3:11 CV 306, 2012 WL 1283427, at *4-7 (D. Conn. Jan. 9, 2012) (holding that the ALJ's decision to allow the VE to testify telephonically "clearly violates the SSA's governing regulations" and constitutes reversible error). The court also need not consider Marvin's third argument—that the ALJ failed to consider Marvin's ability to work on a consistent basis.

by his exertional limitations," the Commissioner "must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform." *Bapp v. Bowen*, 802 F.2d 601, 603, 605 (2d Cir. 1986).

The VE may testify as to the existence of jobs in the national economy and as to the claimant's ability to perform any of those jobs, given her functional limitations. *See Colon v. Comm'r of Soc. Sec.*, No. 6:00 CV 0556, 2004 WL 1144059, at *6 (N.D.N.Y. Mar. 22, 2004). A vocational expert's testimony is useful only if it addresses whether the particular claimant, with her limitations and capabilities, can realistically perform a particular job. *See Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981). The ALJ is responsible for determining the claimant's capabilities based on all the evidence, and the hypothetical questions must present the full extent of the claimant's impairments to provide a sound basis for the VE's testimony. *Colon*, 2004 WL 1144059, at * 6. However, there must be "'substantial record evidence to support the assumption upon which the [VE] based [her] opinion.'" *Id.* at *6 (quoting *Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983)).

As relevant here, "'work which exists in the national economy'"

means work which exists in significant numbers either in the region where the individuals live or in several regions of the country."  SSR 82-53, 1982 WL 31374, at *3 (1982).  This definition is designed "to emphasize that . . . a type(s) of job which exists only in very limited numbers or in relatively few geographic locations may not be said to 'exist in the national economy.'" *Id.*  "Courts have generally held that what constitutes a 'significant' number is fairly minimal."  *Fox v. Comm'r of Soc. Sec.*, No. 6:02-CV-1160, 2009 WL 367628, at *20 (N.D.N.Y. Feb. 13, 2009).

Here, relying on the VE's testimony, the ALJ determined that Marvin could perform the jobs of small product assembler, housekeeper/cleaner, and preparer.  (Tr. at 21-23, 51-52.)  Again relying on the VE's testimony, the ALJ concluded that: (1) for the position of small products assembler, there were 307,082 jobs available nationally, and 849 jobs available regionally; (2) for the position of housekeeper/cleaner, there were 1.1 million jobs available nationally, and 471 jobs available regionally; and (3) for the position of preparer, there were 82,550 jobs available nationally, and 270 jobs available regionally.  (*Id.*)  Upon questioning by Marvin's counsel, however, the VE explained that the numbers to which she testified pertained to a broad range of positions, including jobs that Marvin cannot

perform based on her RFC.  (*Id.* at 62, 64-65; *see id.* at 310-54.)  The ALJ relied on this testimony to determine that Marvin is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  (*Id.* at 21-23.)

Under these circumstances, the VE's testimony was hardly clear as to the number of jobs available to Marvin in the local or national economy.[11] This testimony, therefore, does not constitute substantial evidence.  *See Rosa v. Colvin*, No. 3:12-CV-0170, 2013 WL 1292145, at *9-10 (N.D.N.Y. Mar. 27, 2013); *Johnston v. Barnhart*, 378 F. Supp. 2d 274, 283 (W.D.N.Y. 2005) (finding that the ALJ erred where the VE's testimony concerning numbers of jobs available pertained to broad categories of jobs that included positions other than the two jobs claimant could perform within

---

[11] The court acknowledges that the ALJ addressed this issue at length in his decision.  (Tr. at 22-23.)  The ALJ concluded, however, that the Commissioner met her burden because: (1) "the use of government statistics and the testimony of a [VE] to prove the existence of significant numbers of jobs which a claimant can perform is administratively noticed, and therefore deemed as valid and sufficient from an evidentiary standpoint"; (2) "the claimant is found not disabled within the framework of Medical-Vocational Rules, which take administrative notice of the existence in significant numbers in the national economy of unskilled, entry level jobs within the sedentary, light, and medium occupational categories"; and (3) "[p]roving significant numbers of existing jobs does not necessarily require proof of the exact number of existing jobs."  (*Id.*)  While the court appreciates the ALJ's points, it is nevertheless constrained by case law.  Here, there is no testimony from the VE that indicates that she accounted for the fact that the Occupational Employment Statistics (OES) codes—the source that provided the number of jobs available—included more jobs than Marvin could actually perform, and that she adjusted the number of jobs available accordingly.  Thus, the court cannot conclude that the ALJ's determination, which relied on the VE's testimony, is supported by substantial evidence.

her limitations and the VE could not say how many positions existed for those two jobs); *cf. Kennedy v. Astrue*, 343 F. App'x 719, 722 (2d Cir. 2009) (concluding that a VE's testimony was reliable where the VE acknowledged that the data on which she relied in determining the existence of positions which the claimant could perform also encompassed approximately fifty-nine other [Dictionary of Occupational Titles (DOT)] titles because "it [was] apparent that the expert arrived at her estimated figures . . . by discounting from the total numbers for all [sixty] DOT titles. Thus, the expert's testimony . . . did not introduce any meaningful uncertainty as to the number of . . . positions available in the local or national economy."); *Jones-Reid v. Astrue*, 934 F. Supp. 2d 381, 407 n.13 (D. Conn. 2012) (holding that the ALJ was entitled to rely on a VE's testimony as long as his methodology for determining the number of jobs by DOT code "is not wholly arbitrary and provides a fair estimate of the jobs available in the national economy").  Accordingly, on remand, the ALJ should solicit from the VE an explanation regarding the foundation and reliability of the job numbers.

## VII.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **REVERSED** and

**REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for

proceedings consistent with this Order; and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-

Decision and Order to the parties.

**IT IS SO ORDERED.**

March 31, 2014
Albany, New York

Gary L. Sharpe
Gary L. Sharpe
Chief Judge
U.S. District Court